303 S.E.2d 245

**Tracy HODGE, et al., etc.**

v.

**Leon GINSBERG, Commr., W.Va. Dept. of Welfare.**

**No. 15776.**

Supreme Court of Appeals of West Virginia.

Jan. 27, 1983.

Dissenting Opinion Jan. 28, 1983.

Larry Harless, Charleston, for petitioners.

Chauncey H. Browning, Atty. Gen., Mary Beth Kershner and Joanna Bowls-Vickers,

Asst. Attys. Gen., Charleston, for respondent.

**McGRAW, Chief Justice:**

This is an original proceeding in mandamus. The petitioners are six homeless residents of the City of Charleston.[1] The respondent is Leon Ginsberg, Commissioner of the West Virginia Department of Welfare. The petitioners seek to compel the respondent to provide adult protective services to incapacitated individuals such as themselves and others similarly situated. We find that the petitioners are entitled to such relief, and grant the writ.

The individual petitioners are all persons within the state of West Virginia who lack the means to maintain a permanent residence, and who therefore are often forced to spend their days and nights on public streets, alleys, riverbanks, and other various outdoor locations. The petitioners claim that the Commissioner of the Department of Welfare has a statutory and constitutional duty to provide emergency shelter to enable them and similarly situated persons to adequately sustain life and reasonable health.

The petitioners' statutory claim is based upon the provisions of W.Va.Code §§ 9–6–1 through 9–6–8 (Cum.Supp.1982), the Social Services For Adults Act. The Act is designed to provide protective services to incapacitated adults. *See generally* W.Va. Code § 9–6–2. Specifically, W.Va.Code § 9–6–7 provides:

> The department may develop a plan for a comprehensive system of adult protective services including social case work, medical and psychiatric services, home care, day care, counseling, research and others.
>
> It shall offer such services as are available and appropriate in the circumstances to persons who, other than for compensation, have or intend to have the actual, physical custody and control of an incapacitated adult and to such incapacitated adults or to adults who may request and be entitled to such protective services . . . .

An "incapacitated adult" is defined by the Act as "any person who by reason of physical, mental or other infirmity is unable to independently carry on the daily activities of life necessary to sustaining life and reasonable health." W.Va.Code § 9–6–1(4). The Department of Welfare is authorized to institute proceedings to abate any abuse or neglect of an incapacitated adult or to abate an emergency situation. W.Va.Code § 9–6–4. An "emergency situation" is defined as "a situation or set of circumstances which presents a substantial and immediate risk of death or serious permanent injury to an incapacitated adult." W.Va.Code § 9–6–1(5). The petitioners claim that they are incapacitated adults who are entitled to protective services under the provisions of the Act.

■ We note initially that if the petitioners are members of the class which the Social Services For Adults Act is designed to benefit, they possess a constitutional right to the relief which they seek under Article III, Section 10 of the West Virginia Constitution. As we stated in Syllabus Point 1 of *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981): "Inherent in the republican form of government established by our State Constitution is a concept of due process that insures that the people

---

1. In addition to the six original petitioners, seven other similarly situated persons, as well as the Association for Retarded Citizens in Kanawha and Putnam Counties, Inc., and the Coalition on Alternative Residential Emergency Shelter have been permitted to intervene as parties petitioner. The Court has also granted the motion of Community Kitchen, Inc., and Romero House, Inc., to participate in the proceedings as *amicus curiae.*

    The Association for Retarded Citizens in Kanawha and Putnam Counties, Inc., is a non-profit advocacy group established for the support of retarded citizens in Kanawha and Putnam counties. One of its prime functions is to develop services for its client population which includes a number of homeless individuals. The Coalition on Alternative Residential Emergency Shelter is a voluntary organization concerned about the plight of the homeless, for whom it has and is actively seeking adequate emergency shelter. Community Kitchen, Inc., is an organization which provides daily meals to the poor. Romero House, Inc., is a Catholic worker house of hospitality which offers overnight lodging to persons needing it.

receive the benefit of legislative enactments." Our inquiry therefore focuses on whether the petitioners are entitled to relief under the Act.

The respondent advances two principal arguments in opposition to the petitioners' claim for relief. First, the respondent contends that the petitioners are not "incapacitated adults" within the meaning of the Act. In this regard the respondent argues that the Act is in derogation of the common law, and therefore should be strictly construed against the petitioners. Second, the respondent contends that the provision of protective services under the Act is discretionary, precluding relief by mandamus. We find no merit in these contentions.

The Department of Welfare is a creation of the Legislature, and has as its express purpose the provision of welfare assistance programs "to the end that residents of the State who are subject to the recurring misfortunes of life may continue to have such aid and encouragement as the county alone, the State alone or the State in cooperation with the federal government may provide." W.Va.Code § 9–1–1 (1979 Replacement Vol.). The Department of Welfare has the responsibility of administering welfare assistance programs and possesses "all powers, not inconsistent with state law, as may be necessary for the disbursement and distribution of welfare assistance to those persons qualified therefor in as prompt, fair, orderly, efficient and economical manner as possible." W.Va.Code § 9–2–5 (1979 Replacement Vol.). The Commissioner of the Department of Welfare is the "chief executive officer and administrative head of the department," W.Va.Code § 9–2–2 (1979 Replacement Vol.), who is charged with the "powers, duties and responsibilities granted and assigned to that office ... by law ...." W.Va.Code § 9–2–6 (1979 Replacement Vol.). The Commissioner has specific authority and power to "[e]stablish and maintain such institutions as are necessary for the temporary care, maintenance, and training of children and other persons." W.Va.Code § 9–2–6(9).

One of the primary goals of the Department of Welfare is to provide aid to indigent persons. An "indigent person" is "any person who is domiciled in this State and who is actually in need as defined by department rules and regulations and has not sufficient income or other resources to provide for such need as determined by the department." W.Va.Code § 9–1–2(g) (1979 Replacement Vol.). Qualified indigent persons who apply for assistance "shall be granted state assistance in such form and amount, to such extent, and for such period, as authorized by applicable state laws, rules and regulations of the department and as determined by the department in accordance with such laws, rules and regulations and within limits of available funds." W.Va.Code § 9–3–2 (1979 Replacement Vol.); *see also* W.Va.Code § 9–3–1 (1979 Replacement Vol.).

On April 11, 1981, the Legislature amended chapter nine of the West Virginia Code by adding thereto a new article. *See* 1981 W.Va.Acts ch. 215. The amendment authorized the Department of Welfare to provide social services for adults; established a comprehensive protective service system; and provided for the promulgation of rules and regulations allowing for payment of services to incapacitated persons as defined in the amendment. *Id.* The amendment is now found at W.Va.Code §§ 9–6–1 through 9–6–8, and is titled "Social Services For Adults."

In accordance with the Legislature's directions, *see* W.Va.Code § 9–6–2, the Commissioner of the Department of Welfare promulgated regulations on August 14, 1981, implementing the Social Services For Adults Act. *See* W.Va.Dept. of Welfare, Social Services Manual, ch. 29 (1981). Regulation 29010 defines protective services as "casework, treatment and crisis intervention services provided to adults in hazardous situations who, due to physical and/or mental incapacities, are no longer able to care for their basic needs and who have no one else able or willing to do so." Regulation 29010 further states that the goal of adult protective services is to remedy "neglect, abuse, or exploitation." "Adult neglect" is defined as:

the failure to provide adequate food, ... shelter or medical care ... to an individual who is unable to independently carry on the daily activities of life necessary for maintaining and sustaining a healthful existence. This does not necessarily imply the involvement of another person. When an individual's capacity for self care and management of his own activities of daily living is impaired because of physical or mental handicaps, he may be responsible for self neglect.

W.Va.Dept. of Welfare, Social Services Manual, Reg. 29010C.

The regulations further indicate that valid reasons for providing adult protective services include circumstances where "[t]he individual has been evicted or has inadequate or unsafe housing," or where "[t]he individual has been deprived of adequate food or shelter ...." W.Va.Dept. of Welfare, Social Services Manual, Reg. 29100. Adult protective service clients are defined by the regulations as persons meeting the following criteria:

A. The client will have a serious impairment in physical or mental functioning....

B. The client is functionally disabled in regard to activities of daily living....

C. The client must be 18 years or older and must reside in the community rather than in an institution or nursing home....

D. The client is alone or without a family member, friend or interested party able *and* willing to provide the necessary support to alleviate the presenting problem.

E. The client is in danger of being harmed (through action or inaction by another individual or through his own actions) without intervention at this time. A client may meet the first four characteristics and still manage to function for quite some time. However, in order to classify a case as protective, a precipitating factor (a medical, psychiatric, or social emergency) must exist. If intervention does not occur at this time,

serious consequences (death, physical or mental injury, neglect or maltreatment, failure to receive adequate food, shelter or clothing, deprivation of entitlements, wasting of resources, loss of property or funds, inappropriate relocation) will result.

W.Va.Dept. of Welfare, Social Services Manual, Reg. 29020 (emphasis in original).

The respondent contends that the petitioners are not qualified to receive adult protective services because they do not suffer from physical or mental infirmities as required by the department's regulations. The petitioners, on the other hand, argue that the regulations are unduly restrictive and do not comply with the law enacted by the Legislature.

■ The Social Services For Adults Act defines "incapacitated adult" as "any person who by reason of physical, mental *or other infirmity* is unable to independently carry on the daily activities of life necessary to sustaining life and reasonable health." W.Va.Code § 9–6–1(4) (emphasis added). The term "infirmity" is not defined by the Act. Generally, "[i]n the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meanings." Syllabus Point 1, *Thomas v. Firestone Tire & Rubber Co.*, 164 W.Va. 763, 266 S.E.2d 905 (1980); Syllabus Point 1, *Tug Valley Recovery Center v. Mingo County Commission*, 164 W.Va. 94, 261 S.E.2d 165 (1979).

■ Webster's Third New International Dictionary (1970) defines "infirmity" as "the quality or state of being infirm"; "an unsound unhealthy or debilitated state"; "a defect of personality or weakness of the will." "Infirm" is defined as "not strong or sound physically"; "of poor or deteriorated vitality especially as a result of age"; "weak of mind, will or character"; "not solid or stable." It is clear from these commonly accepted definitions that the term "infirmity" contained in W.Va.Code § 9–6–1(4) encompasses more than the serious physical or mental impairments to which the term is limited by the Department of Welfare's regulations. *See* W.Va.

Dept. of Welfare, Social Services Manual, Reg. 29020A.

■ Contrary to the respondent's representations, the Social Services For Adults Act is clearly remedial legislation which should be construed to achieve its beneficial purposes. *See, e.g., Gibson v. Rutledge,* 171 W.Va. 164, 298 S.E.2d 137 (1982); *Andy Bros. Tire Co., Inc. v. West Virginia State Tax Comm'r,* 160 W.Va. 144, 233 S.E.2d 134 (1977). The purpose of the Department of Welfare is to provide aid and encouragement to the "residents of the State who are subject to the recurring misfortunes of life . . . ." W.Va.Code § 9–1–1. When the definition of "incapacitated adult" contained in W.Va.Code § 9–6–1(4) is read in light of this legislative purpose, it is evident that the Legislature intended a broader application of the statute than that given it by the respondent.

■ While it is true that the interpretation of a statute by the agency charged with its administration should ordinarily be afforded deference, *see, e.g., Security National Bank and Trust Co. v. First West Virginia Bancorp, Inc.,* 166 W.Va. 775, 277 S.E.2d 613 (1981), when that interpretation is unduly restrictive and in conflict with the legislative intent, the agency's interpretation is inapplicable. *See, e.g., Harrison v. Ginsberg,* 169 W.Va. 162, 286 S.E.2d 276 (1982); *see also Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971).

■ We therefore conclude that the term "incapacitated adult" contained in W.Va. Code § 9–6–1 was intended by the Legislature to encompass indigent persons like the petitioners, who, by reason of the recurring misfortunes of life, are unable to independently carry on the daily activities of life necessary to sustaining life and reasonable health.

■ The respondent's remaining contention is that the provision of adult protective services pursuant to the Social Services For Adults Act is discretionary with the Department of Welfare, and therefore mandamus is an inappropriate remedy. In support of his contention the respondent cites the language of W.Va.Code § 9–6–7 which provides that the Department of Health *"may* develop a plan for a comprehensive system of adult protective services . . . ." (emphasis added). We agree with the respondent that the use of the word "may" in a statute often indicates discretion. *See, e.g.,* cases collected at 26A *Words and Phrases* 82–86 (Cum.Supp. 1982); *but see Trail v. Trail,* 56 W.Va. 594, 49 S.E. 431 (1904) (when the word may is in a statute made for the benefit of persons it is not permissive, but mandatory or compulsory). However, the statute relied upon by the respondent further provides that any plan developed by the Department of Welfare *"shall* offer such services as are available and appropriate in the circumstances . . . to adults who may request and be entitled to such protective services . . . ." W.Va.Code § 9–6–7 (emphasis added). "It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Syllabus Point 1, *Nelson v. Public Employees Insurance Board,* 171 W.Va. 445, 300 S.E.2d 86 (1982). Thus, the plan which the Department of Welfare has developed, *see* W.Va. Dept. of Welfare, Social Services Manual, ch. 29, must offer such adult protective services "as are available and appropriate in the circumstances . . . ."

■ The respondent further argues that the language of W.Va.Code § 9–6–2 evidences the legislative intent that the provision of adult protective services is discretionary with the Department of Welfare. The pertinent language of the statute provides that the Commissioner of the Department of Welfare shall promulgate regulations to implement the goals of the statute "to the extent that the Commissioner believes *feasible* under the provisions of this article *within the state appropriations and other funds available* . . . ." W.Va.Code § 9–6–2 (emphasis added). We agree that this language grants the respondent discretion in the drafting of regula-

tions to implement the goals of the Act.[2]

However, the respondent has exercised his discretion in the promulgation of regulations found at Chapter 29 of the Department of Welfare's Social Services Manual. These regulations establish the duty of the department to provide assistance to incapacitated adults who are the victims of neglect, abuse, or exploitation. *See* W.Va. Dept. of Welfare, Social Services Manual, Regs. 29010; 29100; 29120. The Commissioner therefore has a duty to provide assistance to those petitioners who meet these criteria. The assistance provided must be such as "will meet the individual's needs with the least necessary restrictions on his liberty and civil rights." W.Va. Dept. of Welfare, Social Services Manual, Reg. 29120.

The petitioners are individuals who are unable to provide for themselves adequate shelter necessary to sustain life and reasonable health. They seek adult protective services in the form of shelter, food and medical care as incapacitated adults from the Department of Welfare. The lack of shelter, food and medical care which poses a substantial and immediate risk of death or serious permanent injury to an incapacitated adult is a valid reason for intervention by the Department of Welfare through the provision of adult protective services. W.Va.Code § 9–6–1(5); W.Va. Dept. of Welfare, Social Services Manual, Regs. 29020; 29100. The department is required to provide such services as are "appropriate in the circumstances," W.Va. Code § 9–6–7, and which "meet the individual's needs." W.Va.Dept. of Welfare, Social Services Manual, Reg. 29120.

Accordingly, we grant the writ of mandamus directing the Commissioner of the Department of Welfare to provide emergency shelter, food and medical care to the petitioners and other similarly situated persons as required by W.Va.Code §§ 9–6–1 through 9–6–8 and Chapter 29 of the Department of Welfare's Social Services Manual.

Writ granted.

NEELY, Justice, dissenting:

We are asked by the petitioners to dream. We are asked to dream of shelter and safety, food and care, for the homeless of our state. Of a community in which despair is met with succor, and discomfort is relieved. We remember: "The republic is a dream. Nothing happens unless first a dream." [1] We believe that the government men weave, though warped with reality, must be woofed with dreams. As men, we share this dream.

As a court, however, we are translators of dreams into reality, and we are limited to our constitutional role. It is not enough that we, like all men, dream. We must knit the dreams we are asked to dream into the complex fabric of experience, history, consequence, and other dreams that is the law. The majority opinion, though woofed with dreams, is warped with folly, and to this warp I dissent.

Having stipulated the dream, let us now examine the folly. The majority opinion, apart from standing in a general way for the proposition that homelessness is a bad thing, is nearly entirely without meaning. A writ of mandamus is issued to the Commissioner of the Department of Welfare directing that "the petitioners and other similarly situated persons" be provided "emergency shelter, food and medical

---

**2.** The goals of the Act as expressed in W.Va. Code § 9–6–2 are:

    (1) Achieving or maintaining self-sufficiency and self-support,

    (2) Preventing, reducing, and eliminating dependency on the State,

    (3) Preventing, reducing, and eliminating neglect, abuse, and exploitation of adults who are unable to protect their own interests,

    (4) Preventing and reducing institutional care by providing less intensive forms of care, preferably in the home,

    (5) Referring and admitting adults to institutional care only where other available services are inappropriate, and

    (6) Providing services and monitoring to adults in institutions designed to assist adults in returning to community settings.

**1.** Carl Sandburg, *Washington Monument by Night* (1922)

24

care" as "required" by the applicable statutes. It is not clear from the opinion what emergency services beyond those that the Department of Welfare already provides are required, nor is it clear exactly who the class of "similarly situated persons" is meant to include. It is also neither clear what additional expenses are required, nor which current recipients of welfare funds are to be denied their benefits so that whatever the court-ordered program is can be undertaken. The Court appears to me to have said to the Commissioner: "*We* are against homelessness and we want *you*, without funds (since we haven't any spending authority) and without guidance (since we don't want to take the trouble to think the problem through), to do something (but we won't tell you what) about it." This is hardly a zenith in the art of judicial command.

I also disagree with the majority concerning their reading of the statute, but I weary of explaining that a selection of words from a statute does not, merely because the words come from that statute, necessarily embody the statute's meaning. I therefore resort to illustration. To wit, the 4th Amendment to the United States Constitution plainly states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall ... cause ... the persons or things to be seized." Or better yet: "The right ... people ... shall ... be violated ... upon ... persons or things to be seized." Through the magic of ellipsis, great mischief can be accomplished, and the threat of that great mischief should make us wary—even where, as here, the mischief is less great—of the deliberate misreading of statutes as a means of accomplishing even the most charitable of our dreams.

Most readers of the "Social Services for Adults" statute, *W. Va. Code*, 9–6–1 *et seq.* [1981], would conclude that the statute was enacted to provide incapacitated adults who are in another's care some protection from abuse or neglect at their caretaker's hands, *see* particularly, *W. Va. Code*, 9–6–4 [1981], and to permit peace officers to offer transportation to a hospital to any incapacitated

adult who is then and there in an emergency situation, so that immediate remedial treatment may be provided. *W. Va. Code*, 9–6–5 [1981]. Most readers would also have noticed that the word "housing" does not appear in the statute, whose entire thrust is toward the provision of temporary emergency care. In fact, the stated purposes of the statute indicate that its design is to wean its beneficiaries of dependency on the state. *W. Va. Code*, 9–6–2 [1981]. Most readers, I expect, would consider that stated purpose to conflict directly with the new entitlement the majority has read into the statute.

The Department of Welfare's records reveal that the original petitioners either misrepresented that they had been denied assistance by the Department of Welfare or else had failed to obtain such assistance by the simple expedient of not applying for it. The "controversy" was restored when a new crop of petitioner-intervenors were allowed to intervene two working days before the oral argument, several of whom allege that they are homeless as a result of the Department of Welfare's refusing to assist them. Although these allegations may be true, and establish a "controversy," they do not establish with any particularity the class of people for whom the Commissioner is required to provide housing. Does it include people in certain income brackets only? Does it include those with sufficient income to pay rent who prefer to spend their income on alcohol? Does it include those who simply don't like the shelters currently run by charitable organizations? Should the opinion be read to eradicate any distinction between temporary and permanent housing? Is the current Emergency Assistance program run by the Department of Welfare, which provides temporary shelter, swallowed by the new program, which appears to contemplate permanent housing for anyone unwilling or unable to pay rent? Can anyone be turned down?

The Commissioner of the Department of Welfare is no doubt as concerned with the answers to these questions as I am, yet we receive no guidance from the majority.

The Court has pretended that this is an issue resolvable by writ of mandamus by in turn pretending that the Department of Welfare had a non-discretionary duty to undertake this kind of broad housing reform before the majority opinion was written. The Court cannot tell the Department of Welfare what it expects because it must maintain the pretense that the duty was non-discretionary, and that the Department of Welfare "already knows" who is to be included.

A similar analysis applies to the question of what is to be done for this class, assuming that it can be defined. What are the standards of care? What are the State's liabilities? For how long must people be housed? Where may they be housed? Where are shelters to be established? How far may people be moved to a shelter? What if they are reluctant to move? The fictions that the Court has entertained in order to avail itself of this opportunity for moral self-congratulation prevent the Court from providing answers to these and other vital questions. As with the scope of the class, the duty to house the homeless is considered non-discretionary, so the Department of Welfare must already know what to do.

Since we are not a legislature, and have no spending authority, we cannot pay for whatever reforms it is we have required. The costs must be paid from the Department of Welfare's own budget. The noble lustre of the Court's heroic decision is slightly tarnished, to my mind, by the fact that we ourselves do not shoulder the burden of this wondrous reform; rather we have dropped it on the backs of the traditional clients of the Department of Welfare—the children, aged, blind, and disabled of our state.

The moral of the story is that it is not enough for us merely to emote on issues. We are judges, and are given the respect and the salaries that come with the job, in order to, with patience (at least) and wisdom (at best), craft sensible and realistic solutions to the problems it is incumbent upon us to solve. I am not convinced that it is incumbent upon us to solve this problem, at least as formulated, and I am absolutely convinced that the sense and realism of the majority opinion are entirely inadequate.