591 S.E.2d 93

Gregory A. CORLISS, Janet Stine, Paul Burke, Archibald M.S. Morgan, III, Lillian Potter Saum, and Suellen Myers, Petitioners Below, Appellees,

v.

JEFFERSON COUNTY BOARD OF ZONING APPEALS, Respondent Below, Appellee,

and

Arcadia Development Company, William Henderson and Ginger Henderson, Intervenors Below, Appellants.

No. 31119.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 9, 2003.

Decided Oct. 10, 2003.

Starcher, C.J., concurred separately.

McGraw, J., dissented.

Gregory A. Corliss, Janet Stine, Paul Burke, Archibald M.S. Morgan, III, Lillian Potter Saum and Suellen Myers, Appellees, Pro Se.

J. Michael Cassell, Assistant Prosecuting Attorney, Charles Town, for the Appellee, Jefferson County Board of Zoning Appeals.

Peter L. Chakamakian, Alice Chakmakian, Charles Town, Richard G. Gay, Nathan P. Cochran, Berkeley Springs, for the Appellants.

ALBRIGHT, Justice.

Arcadia Building Company ("Arcadia") and William and Ginger Henderson [1] appeal from the February 14, 2002, decision of the Circuit Court of Jefferson County in which the conditional use permit previously issued to them by the Jefferson County Planning Commission ("Commission") was vacated. Arcadia had sought and obtained the permit for the purpose of developing a residential subdivision known as Harvest Hills. Six individual landowners [2] (hereinafter referred to as "Landowners") sought review by the circuit court of the administrative decision to issue a specialized zoning permit for the Harvest Hills development.[3] The Landowners objected to the proposed development based on concerns that residential use of the land would negatively affect their agrarian use of neighboring property. Arcadia [4] argues that, in reversing the decision of the Appellee Jefferson County Zoning Board of Appeals ("Zoning Board"), the circuit court wrongly substituted its judgment for that of the Zoning Board and circumvented established rules of review. Having carefully reviewed this matter, we find that the lower court erred in overturning the Zoning Board's decision by not adhering to the limited scope of review applicable to this type of administrative proceeding and by altering the established manner in which adjacent property measurements are determined for purposes of evaluating a conditional use permit application. Accordingly, we reverse.

I. **Factual and Procedural Background**

 The property at issue which Arcadia seeks to develop is located in the Rural District of Jefferson County. Despite its "rural" designation, the Jefferson County Zoning and Development Review Ordinance (hereinafter referred to as the "Ordinance") provides for twenty-two principal permitted uses, including low-density single-family residential development and farming. The Ordinance sets forth a specified maximum number of lots that are allowed in the Rural District as a matter of right. Even though the maximum number of lots had been reached in this district,[5] the Ordinance provides a mechanism whereby a "conditional use permit" application may be filed to seek the Commission's permission for an already approved use of the land.[6] Seeking such a permit, Arcadia submitted an application and the required support data to the Commission on December 19, 2000, for the purpose of

---

1. Mr. and Mrs. Henderson are the owners of the property on which Arcadia plans to develop residential home sites.

2. Those individuals are: Gregory A. Corliss, Janet Stine, Paul Burke, Archibald M.S. Morgan III, Lillian Potter Saum, and Suellen Myers.

3. Arcadia and the Hendersons intervened in the review proceedings filed with the circuit court.

4. Since the positions of the Hendersons and Arcadia are essentially synonymous, references to Arcadia are meant to denote the Hendersons as well.

5. The Ordinance provides that for the Rural District a "property owner may create one (1) lot for every ten (10) acres with a minimum lot size of three (3) acres." There are additional provisions regarding the subdivision of lots.

6. As we explained in syllabus point one of *Harding v. Board of Zoning Appeals*, 159 W.Va. 73, 219 S.E.2d 324 (1975):

 A special exception or conditional use, unlike a variance, does not involve the varying of an ordinance, but rather compliance with it. When it is granted, a special exception or conditional use permits certain uses which the ordinance authorizes under stated conditions.

developing Harvest Hills. According to the conditional use permit application, the subject real estate contains 371 acres and Arcadia intends to subdivide this property into approximately 392 single-family housing lots.

Pursuant to the procedures known as the Development Review System ("DRS"), which are set forth in the Ordinance, the Commission undertook an evaluation to determine whether the requested conditional use permit should be issued. As part of that process, a Land Evaluation and Site Assessment ("LESA") was performed by the Zoning Administrator, Paul Raco. The LESA evaluation utilizes a numeric rating scale which involves two components: a soils assessment that accounts for 25% of the LESA score and an amenities assessment that accounts for the remaining 75% of the LESA score. Upon the conclusion of the LESA evaluation, the combined score of these two components was 57.47.[7] Only if this score was 60 or less could the DRS process continue. Given the appropriate range of the LESA score, the proposed development proceeded to the Compatibility Assessment Meeting. This stage of the review process provides a public forum for local citizens to voice their specific concerns about the development under consideration.

Following proper notice,[8] a Compatibility Assessment Meeting was held on February 28, 2001. At this meeting, which was attended by both the Landowners and other interested citizens, numerous concerns were raised in connection with the proposed development.[9] Arcadia, as reflected by the Staff Report prepared by the Commission, agreed to take specific action with regard to seventeen enumerated concerns that were raised at the meeting.[10] Because there were six unresolved issues [11] that surfaced during the

7. The property received a score of 19.47 for the soils assessment and a score of 38 for the amenities assessment.

8. The details regarding the meeting's date, time, and location were published in a local newspaper on February 8 and 15, 2001.

9. According to the Staff Report prepared by the Commission following the compatibility meeting the following concerns were raised: "restoration of historic train station; density; water and sewer availability and service; buffers; traffic problems; sharp curve on Route 17; lighting; soils; fencing of property; preservation of farmland; impact on schools and services; stream and wetland protection; noise buffers; stormwater management; maintenance of subdivision roads; homeowner's association; impact on adjacent farms; voluntary impact fees; surveys of liability of development on adjoining property owner; trespassing on to adjoining properties from proposed subdivision; and [ ] incompatib[ility] with surrounding neighborhood."

10. The concerns which Arcadia agreed to address or resolve were as follows:
1. Cooperate with nonprofit groups to preserve the historic train station with the permission of the record owner of the property;
2. Execute a bond to fix the curve on Route 17 (Flowing Springs Road) if title is obtained by the West Virginia Department of Highways to do so;
3. Install no street lighting;
4. Disclose to potential buyers the intensity of the train traffic;
5. Build a fence between the development and the railroad tracks;
6. Discuss and encourage telecommunications link-ups with utility companies;
7. Inform potential buyers of farming activities in the area (i.e., smells, noises, animals, equipment) and the farmers right to farm;
8. Prepare a traffic study;
9. Install a traffic light at the intersection of Route 17 and Melvin Road if warranted by the West Virginia Department of Highways;
10. Provide quality control of storm water management to County standards;
11. Provide buffers to lessen the impact of the development on the Duffield's historic area;
12. Not to increase the density more than what is currently proposed;
13. Not to relinquish any property they do not own;
14. Provide a fence between the development and Sullen Myers property;
15. Provide economic study to determine the cost of services versus tax collections;
16. Not locate a water tank on the property;
17. Give the land earmarked for the School Board to the Jefferson County Parks and Recreation Commission or other sports organization if not used by the School Board.

11. The unresolved issues were:
1. Pay voluntary impact fees;
2. Change the subdivision name;
3. Guarantee that Ms. Sullen Myers will be held harmless from any lawsuit if someone from the development trespasses onto her property and is injured;
4. Provide economic study to determine the cost of services versus tax collections and add that amount to the sale of the lot as an impact fee;

meeting, a public hearing was scheduled for May 22, 2001, to address those specific issues.

Within a week of the compatibility meeting, two of the Landowners [12] jointly filed two separate appeals with the Zoning Board. In the first appeal, they averred that the Commission and/or the Zoning Administrator miscalculated the LESA score. They argued that if the Ordinance been properly applied with regard to the factors of adjacent development; proximity to schools; public water availability; and public sewer availability, the LESA score would have exceeded the maximum of 60. In a second appeal filed by these same Landowners, they alleged that the data submitted by Arcadia in support of its conditional use permit application was legally insufficient. After consolidating the two appeals, the Zoning Board held a public hearing on these issues on April 19, 2001. The Board, following the presentation of argument, voted to deny the appeal.[13] On May 17, 2001, the Board issued Findings of Fact and Conclusions of Law in support of both of its decisions to deny the Landowners' challenges.[14]

The public hearing previously scheduled by the Commission to address the unresolved issues [15] took place on May 22, 2001. After hearing the proffers of Arcadia pertaining to these issues, the Commission voted 8 to 3 to approve the issuance of the conditional use permit. The Landowners utilized the statutory remedy of applying for a writ of certiorari [16] to obtain judicial review of the Zoning Board's decision. Like the Zoning Board, the circuit court consolidated the two appeals for purposes of its review. On February 14, 2002, the lower court issued its decision in which it vacated the Zoning Board's decision to issue the conditional use permit and remanded the matter to the Commission for further proceedings consistent with the circuit court's rulings. As support for its ruling, the lower court found error with regard to the underlying administrative determinations concerning the adequacy of the submitted support data and found the method by which the Zoning Administrator measured adjacent development in conjunction with the amenities component of the LESA score to be inconsistent with the Ordinance's purposes.[17] Arcadia appeals from the lower court's decision to vacate the administrative decision to issue the conditional use permit, a decision that was initially reached by the Commission and subsequently affirmed by the Zoning Board.

## II. Standard of Review

As we explained in *Webb v. West Virginia Board of Medicine*, 212 W.Va. 149, 569 S.E.2d 225 (2002), "[o]n appeal, this Court reviews the decisions of the circuit court under the same standard of judicial review that the lower court was required to apply to the decision of the administrative agency." *Id.* at 155, 569 S.E.2d at 231; *accord Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995). The standard that applied to the circuit court's review of the consolidated appeals from the Zoning Board was announced in syllabus point five of *Wolfe v. Forbes*, 159 W.Va. 34, 217 S.E.2d 899 (1975): "While on appeal there is a presumption that a board of zoning appeals acted correctly, a reviewing court should reverse the administrative decision where the board has applied an erroneous principle of law, was plainly wrong in its

---

5. Provide a historic and archeological study of the property;
6. Reduce the density.

**12.** Ms. Stine and Mr. Burke.

**13.** Separate votes were taken with regard to each of the appeals. The Board voted 3 to 2 to deny the appeal which challenged the LESA score and voted 4 to 1 to deny the appeal challenging the sufficiency of the support data.

**14.** *See Harding*, 159 W.Va. at 82, 219 S.E.2d at 329–30 (requiring preparation of written findings

of fact by zoning board upon decision to grant or deny conditional use permit application).

**15.** *See supra* note 10.

**16.** *See* W.Va.Code § 8–24–59 (1969) (Repl.Vol. 1998).

**17.** The court found no error with regard to the LESA calculations pertaining to school proximity; public water availability; and public sewer availability.

factual findings, or has acted beyond its jurisdiction."

█ We have further recognized that "[i]n cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syl. Pt. 2, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996). With these standards in mind, we proceed to consider the parties' arguments.

## III. Discussion

Arcadia and the Zoning Board argue that the lower court failed to conduct its review according to the three-pronged standard set forth in *Wolfe* and further ignored a decision of this Court that addresses the limited significance of a county's comprehensive plan [18] when compared to subsequently enacted zoning laws. *See Singer v. Davenport*, 164 W.Va. 665, 668, 264 S.E.2d 637, 640 (1980). They further contend that the lower court merely substituted its judgment for that of the Commission and the Zoning Board, as is evidenced by the circuit court's failure to identify the error committed below within the parameters of *Wolfe* and by the lower court's singular and selective emphasis throughout its order on the goal of farmland preservation, one of *multiple* goals/purposes

recognized in the Comprehensive Plan and the Ordinance.

### A. Inadequate Support Data

█ An applicant seeking a conditional use permit is required to submit certain items of support data that address each of twenty-three items,[19] which range from rudimentary information regarding the developer's name and address to specifics about the soil conditions and the ability of the current infrastructure to support the proposed development. In reviewing the support data submitted by Arcadia, the lower court correctly recognized that "[t]he responsibility for determining the 'adequacy' of the support data submitted rests with the Zoning Administrator in the first instance, but his determination of adequacy is reviewable by the BZA, in this Court, and in the Supreme Court of Appeals." Despite the existence of written findings of fact and conclusions of law prepared by the Zoning Board in the appeal related to the support data, the lower court omitted any reference to those specific findings in its order. Instead, the lower court cited a letter dated April 19, 2001, prepared by the Zoning Administrator in which he stated his position regarding the adequacy of the support data:

The Appellants have failed to show how they have been aggrieved by alleged inadequacies of the support data. Even if it was

**18.** A comprehensive plan was adopted by Jefferson County in 1994, six years after the County Commission enacted the Ordinance.

**19.** Pursuant to § 7.4(d) of the Ordinance, the following items are enumerated for purposes of submitting the requisite support data:
1. Name and address of owner/developer.
2. Name and address of contact person.
3. Type of development proposed.
4. Acreage of original tract and property to be developed.
5. General description of surface conditions (topography).
6. Soil and drainage characteristics.
7. General location and description of existing structure.
8. General location and description of existing easements or rights-of-way.
9. Existing covenants and restrictions on the land.
10. Intended improvements and proposed building locations including locations of signs.

11. Intended land uses.
12. Earth work that would alter topography.
13. Tentative development schedule.
14. Extent of the conversion of farm land to urban uses.
15. Effected wildlife populations.
16. Ground water and surface water and sewer lines within 1320 feet.
17. Distance to fire and emergency services that would serve the site.
18. Distance to the appropriate elementary, middle, and high school.
19. Traffic characteristics—type and frequency of traffic; adequacy of existing transportation routes.
20. Demand for school services created by this development.
21. Proximity and relationship to historic structure or properties within two hundred (200) feet.
22. Proximity to recreational facilities.
23. Relationship of the project to the Comprehensive Plan.

inadequate they were not injured by it because they addressed the issues in their appeal.

Even so, this has been addressed by this Board in the past. *The Ordinance simply lists things to address. It doesn't explain what is acceptable.* In this case the developer addressed them to the best of his ability. Unless it contains untrue statements it should be adequate. (emphasis supplied)

Essentially dismissing the Board's recognition that the Ordinance does not require specified levels of detail, the lower court downplayed the significance of the Board's position in favor of "correcting" an improper interpretation and application of the law.

In section 7.4(g), the Ordinance squarely addresses who has responsibility for finding submitted support data to be inadequate: "The Zoning Administrator shall determine if the sketch plan and support data are adequate." In this case, the submission of Arcadia's support data did not prompt the Zoning Administrator to make a finding of inadequacy. When this issue was presented on appeal, the Zoning Board concluded:

that the Appellants fail to demonstrate that the Zoning Administrator abused his discretion or failed to render his determination regarding the adequacy of the plan and support data in conformity with Section 7.4. *The Board rejects the Appellants['] contention that the support data and sketch plan are wholly inadequate for an informed public discussion regarding this project.* (emphasis supplied)

Dismissing the value of the Board's finding, the lower court determined in conclusory fashion that "no serious review of the adequacy of the support data was made."

Making its own findings on the issue of adequacy, the lower court stated as follows:

The support data packet submitted by the Developers failed to address the following specific items required by the Ordinance: type and frequency of traffic; adequacy of existing transportation routes; locations of signs; and did not contain a discussion of ground water or of the project's effect upon wildlife populations. These omissions, and the abbreviated nature of the

support data narrative in general, are inconsistent with the purposes for the requirement of providing support data set forth in the Ordinance, i.e., "public review" in preparation for a dialogue as to "compatibility" and as material upon which the Commission will base, in part, its decision whether to issue the conditional use permit.

Our review of the record discloses that Arcadia did in fact address each of the twenty-three areas of required support data. For example, as to the category of "effected wildlife populations," Arcadia responded: "There are no known rare or endangered species of wildlife indigenous to this site. Two letters have been received from the DNR[;] they are attached as exhibits. Wildlife populations will not be affected although some nests or dens of individual animals may be displaced." In similar fashion, there was information supplied with regard to the category designated as "ground water and surface water and sewer lines within 1320 feet: Elk Branch borders the northern property boundary. This stream is well defined with, stable vegetated banks. There are no sewer lines within 1320 feet." As to the category of "traffic characteristics-type and frequency of traffic; adequacy of existing transportation routes," the support data supplied the following information:

This site will generate the usual residential traffic. It is anticipated that many of the home buyers, at least the ones who are commuters, may take advantage of the proximity to the rail stop and commute to their jobs by train. The developer has been talking to the West Virginia State Highway Department for several months about removal of the curves to the south of the property. The developer expects to share in the cost of this work.

Upon our review of the support data, we can reach only one conclusion—while the circuit court may have been correct in its characterization of the support data as "abbreviated," there was no failure of Arcadia to provide information responsive to the twenty-three categories and certainly there was no omission of information that would rise to

the level of inadequacy in terms of the Ordinance's purpose of requiring the submission of support data. The Zoning Administrator was correct in his observation that the Ordinance "simply lists things to address. It doesn't explain what is acceptable." In conducting its review on the issue of adequacy, the lower court appears to have been overly focused on quantitative concerns, given its observation that "for a project of this size, the intent of the Ordinance's support data provisions is not served by the submission of four pages of narrative containing a mere 103 lines of responsive material (aside from the soils data) in addressing the 23 data points as to which information is sought."

That the lower court recognized the objective underlying the support data requirement is clear from its finding that "the purpose ... is to reveal issues relating to compatibility and to provoke discussion among the developer/landowner, the interested public and the county's land use officials as to matters that would be relevant to compatibility." The Staff Notes from the Compatibility Assessment Meeting make clear that a comprehensive and seemingly thorough public review of the Harvest Hills development did take place and, as a result of that public scrutiny, specific agreements were reached addressing the majority of the concerns raised by the citizens who attended this meeting.[20] As discussed above, those issues that could not be resolved during the first public meeting were scheduled for further discussion at a subsequent public hearing. On review, the DRS process appears to have worked in its intended fashion by providing a public forum to address and seek resolution of pertinent development-related issues. Accordingly, we cannot concur with the circuit court's conclusion that the support data and its level of detail somehow operated to thwart the Ordinance's objective of "public review." [21]

Based on the broadly-worded categories of support data combined with the Ordinance's unmistakable purpose of requiring this data to facilitate "an informed public discussion," we cannot conclude that a quantitative analysis of the support data is the manner in which the standard of adequacy is to be determined under the Ordinance. Neither are we able to hone in some fashion how much detail is required with regard to examining support data for purposes of adequacy. In this Court's opinion, the key to determining adequacy has to be based on whether the support data was sufficient in terms of enabling the desired public debate to occur with regard to the proposed development. Both the Zoning Administrator and the Zoning Board found the support data submitted by Arcadia adequate to enable the desired goal of public discourse on the proposed development. Moreover, the record makes clear that a detailed public debate did occur and furthermore, that Arcadia agreed to take specific action in response to the bulk of public concerns raised at the Compatibility Assessment Meeting.[22] Given the manner in which the public appeared, raised particularized concerns, and action, or agreement to take action, resulted with regard to those concerns, it appears that the DRS process worked in the fashion intended by the Ordinance's drafters.

In discarding the administrative determinations that the submitted support data was adequate, the lower court appears to have wrongly substituted its judgment for that of the administrative entities charged with handling zoning matters. It is axiomatic that "[i]nterpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." Syl. Pt. 4, *Security Nat'l Bank & Trust Co. v. First W. Va. Bancorp.*, 166 W.Va. 775, 277 S.E.2d 613 (1981). The record in this case suggests that the lower court overlooked its duty to give the appropriate amount of defer-

**20.** *See supra* note 9.

**21.** Of note is the fact that the best the lower court could offer on this point is the suggestion that "attenuated" support data "could stifle discussion of important issues and/or unfairly shift the burden of gathering data required for an informed discussion." Interestingly, the circuit court made no finding that the intended public review was affected in such a potentially negative fashion; it merely raised the possibility of such an occurrence.

**22.** *See supra* note 10.

ence to the administrative decision and Zoning Board's affirmance of that decision regarding the adequacy of the support data. While acknowledging on the one hand that "[m]atters that are within the Commission's expertise ... would be best left to the Commission in the first instance" for purposes of determining the appropriate support data that is required, the circuit court proceeded to make its own findings on the issue and to further suggest that the Commission should implement usage of forms containing questions that might prompt a more thorough response to the support data categories.

Were the submission of the support data an end in itself to the DRS process, we might be more inclined to agree with the circuit court's suggestion that extensive detail is required when such data is initially submitted as part of the conditional use permit application. Importantly, that support data provides a launching point from which the public can begin to participate in and the Zoning Administrator and the Commission can conduct the multi-stage reviewing process that is involved in any application for a conditional use permit. Given the clear purpose of the support data to provide a mechanism for public debate relevant to such areas and the undisputed evidence that such public debate did freely occur in this matter,[23] we cannot agree with the circuit court's finding that the support data was "inadequate" or that the determinations made by the Commission and the Zoning Board on this issue were incorrect. Accordingly, we find that the lower court abused its discretion in reversing the Zoning Board on this issue.

23. In its memorandum submitted to the circuit court below, the Zoning Board observed that "[t]he public participated fully and substantially throughout these proceedings" and further that "[t]here is no evidence and no claim that the public was excluded or that anyone was unable to fully develop their position regarding this project."

24. These items are: (a) size of site; (b) adjacent development; (c) distance to growth corridor; (d) comprehensive plan compatibility; (e) proximity to schools; (f) public water availability; (g) public sewer availability; (h) roadway adequacy; and (i) emergency service availability.

## B. Incorrect Method of Land Measurement

As the second basis for vacating the Zoning Board's order, the circuit court ruled that the Zoning Administrator erred by using the boundary or linear method of land measurement in calculating that part of the LESA score which pertains to adjacent development. In scoring the amenities assessment portion of the LESA evaluation, there are nine separate items[24] that are scored, one of which is "adjacent development." The Ordinance describes this criterion as assessing

> a combination of the percentage of land in actual agricultural use (including timber or pasture land) and percentage of adjacent land that does not indicate that there is development pressure. Intense development pressure includes more than a 5 lot subdivision and commercial or industrial uses. An average of the two will yield a percentage of land adjacent to the property that is either farmed or not intensely developed.

Depending on the resulting percentage, a specified number of points are added into the LESA score.[25]

The lower court expressly found that "[t]he Ordinance specifies no measurement method" and that "[t]he Zoning Administrator measured the adjacent land by linear boundaries." As to the longstanding practice of the Zoning Administrator—since the enactment of the Ordinance in 1988 to utilize the linear method of land measurement—the circuit court found: "The record reflects that the Zoning Administrator has followed the linear boundary method of measurement in this context for many years, and that it is

25. For example, if 86 to 100% of the land is either farmed or not intensely developed, then the award is ten points (the maximum award) and if 26 to 40% falls into the undeveloped category, the award is only 1 point. Based on the land measurement calculations performed by the Zoning Administrator in this case, the percentage of undeveloped land was determined to be 72.4% based on the linear method, which resulted in a LESA assessment of 6 for the adjacent development component.

also the method he has utilized in evaluating land usage in the context of other conditional use permit requests under the Ordinance."

When this issue was appealed by the Landowners to the Zoning Board, the Board found as follows:

5. The Board concludes that the assessment of points for Adjacent Development should be calculated by measuring the boundaries of adjacent parcels and then determining the uses of each adjacent parcel. The Board rejects the Appellants' [Landowners] contention that the land area or acreage of the adjacent parcels of land should be the proper method of measurement.

6. The Board concludes that the operative language contained in Section 6.4(b) is *adjacent development* and *adjacent land.* The word *adjacent* is defined by Websters New World College Dictionary, Fourth Edition, 1999, as that which is adjoining, i.e.: something that touches something else at some point or *along a line.*

7. The Board concludes that Section 6.4(b) does not specify land area or acreage as the proper measurement of adjacent land or adjacent development. The Board would further note that specific definitions of land area and lot area are contained in the Definition section of the Ordinance.

8. Therefore, the Board concludes that the Zoning Administrator's assessment of points of adjacent development is in conformity with Section 6.4(b) and should be affirmed.

As its justification for replacing the established linear method of measuring adjacent land for purposes of conditional use permit applications with its preferred acreage method, the circuit court offered:

The Court has given this matter careful consideration and is compelled to agree with Petitioners [Landowners] that while the Ordinance fails to specify a method to be used, the land area method of measurement appears, in this context, to be much more consistent with the expressed pur-poses and intent of the Development Review System, Conditional Use Permit process, the Comprehensive Plan, and the Code. The Court agrees with Petitioners that the boundary method of measurement appears to disfavor farmland preservation and to favor development. The Court believes this is because the boundary method of measurement fails to take account of the depth of adjacent parcels. The Court sees no reason that a method of measurement should be used which, although it is simpler than measuring by land area, ignores the true size of the adjacent parcels.

■ Just as the circuit court completely sidestepped the Board's decision as to adequacy, the court similarly ignored the expertise the administrative entities involved in this case have developed with regard to land measurement and its consequent obligation to accord such expertise/judgment a significant level of deference barring any clear error. The lower court appears to have wholly disregarded its obligation to accord a presumption of correctness with regard to the Board's long term approach to this issue of measuring adjacent parcels of land for purposes of calculating one aspect of the LESA score. *See Wolfe,* 159 W.Va. at 35, 217 S.E.2d at 900, syl. pt. 5. As justification for its decision to alter the established method of land measurement, the lower court cited syllabus point five of *Hodge v. Ginsberg,* 172 W.Va. 17, 303 S.E.2d 245 (1983), in which this Court held that "[w]hile the interpretation of a statute by the agency charged with its administration should ordinarily be afforded deference, when that interpretation is unduly restrictive and in conflict with the legislative intent, the agency's interpretation is inapplicable." Given the absence of any explanation as to how the lower court concluded that the linear method of land measurement was either "unduly restrictive" or "in conflict with the legislative intent," other than indicating a preference for a method of measurement favoring farmland preservation over development, the lower court appears to have simply "rewritten" [26] the Ordinance to

---

26. The Court further "rewrote" the Ordinance in declaring in its order that it would "not enforce the Ordinance's provisions requiring an average to be taken in subsection 6.4(b) because the Court perceives the taking of an average to run

reach a different result in terms of the LESA score.[27] *See* Syl. Pt. 1, *Consumer Advocate Div. v. PSC*, 182 W.Va. 152, 386 S.E.2d 650 (1989) (holding that "[a] statute, or an administrative rule, may not, under the guise of 'interpretation,' be modified, revised, amended or rewritten").

Arcadia argues that the lower court wrongly elevated the goals of the Comprehensive Plan[28] over the objectives of the Ordinance[29] in its effort to adopt a land measuring method that would favor farmland preservation. In so doing, Arcadia suggests that the circuit court circumscribed this Court's clear recognition in *Singer* that "the comprehensive plan is to be used by the Planning Commission to aid them in drawing

up their subdivision ordinances" and that such plans were "never intended to replace definite, specific guidelines; instead, it was to lay the groundwork for the future enactment of zoning laws." 164 W.Va. at 668, 264 S.E.2d at 640. We further clarified that the comprehensive plan had no effect as a separate legal instrument. *Ibid.*

Arcadia and the Zoning Board argue that the lower court wrongly elevated the importance of the Comprehensive Plan, observing that the court "selectively excised only those portions of the Comprehensive Plan which pertain to the preservation of agriculture." Rather than placing the Comprehensive Plan in its proper context—as a reference for purposes of applying the Ordinance[30]—the

---

counter to the purpose of that subsection and indeed all of Section 6.4 of the Ordinance."

27. The lower court's willingness to alter the Ordinance's application on this issue is certainly inconsistent with its position as to several of the other LESA challenges in which the court indicated that "[t]o require more at this early stage of the project would seem to require the Ordinance to be amended to be more explicit" (referencing public sewer availability) and that "for the Ordinance itself to operate with greater force with respect to the adequate public facilities issues, it would need to be amended."

28. The goals included in the Comprehensive Plan are the following:

Encourage growth and development in areas where sewer, water, schools and other public facilities are available or can be provided without excessive cost to the community.

Insure that growth and development are both economically and environmentally sound.

Promote the maintenance of an agricultural base in the County at a level sufficient to insure the continued viability of farming.

Encourage and support commercial, industrial, and agricultural activities to provide a healthy, diversified, and sound local economy.

Promote the conservation of the natural, cultural, and historical resources and preserve the County's scenic beauty.

Advocate the maintenance and improvement of the transportation system so that people and goods can move safely and efficiently throughout the County.

Provide safe, sound, decent housing for all residents of the County.

Give citizens a chance to affect the course of planning activities, land development, and public investment in Jefferson County.

Establish a planning framework within which the various conflicting activities and objectives can coexist, while providing logical, continu-

ing, and far sighted guidance for the future of the community.

Support and defend private property rights while ensuring overall public health, safety, and general welfare.

29. The purposes of the Ordinance are enumerated as follows:

(a) Protect and encourage the health, safety and general welfare of the present and future population of Jefferson County.

(b) Help guide the future growth and development of Jefferson County in accordance with the adopted Comprehensive Plan.

(c) Encourage growth and development in areas where sewer, water, schools, and other public facilities are or will soon be available in order to provide services in the most cost effective manner.

(d) Insure that growth and development are both economically and environmentally sound.

(e) Encourage the maintenance of an agricultural base in the County at a level sufficient to insure the continued viability of farming.

(f) Encourage and support commercial, industrial, and agricultural activities while maintaining land use, order and compatibility.

(g) Encourage an improved appearance of Jefferson County with relationship to the use and development of land and structures.

(h) Encourage the conservation of natural resources.

(i) Provide a guide for public action in the orderly and efficient provision of public facilities and services.

(j) Provide a guide for private enterprise in developing and building a strong economic community.

(k) Encourage historic preservation.

30. The Legislature has declared that the "comprehensive plan shall be made with the general

lower court declared the Plan and the Ordinance to be on equal footing for purposes of resolving any issues involving interpretation. Evidence of the weight accorded to the Comprehensive Plan by the circuit court is found in the court's declaration that it "interprets the ordinances *in pari materia* with the Comprehensive Plan and should, to the extent feasible, construe the ordinances to be consistent with the Comprehensive Plan." Following this pronouncement in its order, the circuit court proceeded to set forth only those goals or statements from the Comprehensive Plan which pertain to farm industry preservation. Our review of the record suggests that the lower court did place undue emphasis on the singular concern of agricultural preservation when in fact this particular objective is but one of many goals identified in either the Ordinance or the Plan.[31]

Given the lower court's emphasis on agricultural preservation, it is difficult to conclude that the lower court's finding on the issue of land measurement was not affected by this seemingly singular focus. In rather arbitrarily adopting an entirely new method of land measurement—one that significantly differs from that used by the Commission for over thirteen years—we are inclined to agree with the Zoning Board's position that the lower court has usurped the legislative function accorded to the Commission in whose responsibility the drafting of such zoning ordinances is reposed. Critically, the lower court did not find error through the use of the linear method of land measurement—only that the method of acreage measurement was more consistent with the Comprehensive Plan and the goal of farmland preservation. Were farmland preservation the only interest that was sought to be protected through both the Comprehensive Plan and the Ordinance, we might be able to find some merit in the lower court's findings relevant to land measurement. Since that is not the case, however, we are compelled to reach the conclusion that the lower court committed error in altering the established method of measuring adjacent land for purposes of

evaluating applications seeking a conditional use permit.

## C. Standing of Landowners

■ Arcadia argued below and the lower court rejected its contentions that the Landowners lacked the requisite standing to seek review of the Board's actions pursuant to the provisions of West Virginia Code § 8–24–59. That provision extends standing to "[a]ny person or persons jointly or severally aggrieved by any decision or order of the board of zoning appeals . . . ." *Id.* Maintaining that the term "aggrieved" connotes an injury that is peculiar to the individual in a manner separate from that of other taxpayers and residents, Arcadia contends that the Landowners fail to qualify as "aggrieved" individuals entitled to review under the statute.

■ In challenging the Landowners' standing, Arcadia posited that their "only interest in the Harvest Hills project arises from concerns about residential growth, overcrowded schools, inadequacy of essential public services such as sewer and water service, a lowering water table, and increased and congested traffic." Submitting that these generalized concerns failed to differentiate these particular citizens from any other Jefferson County landowners, Arcadia contended that the Landowners could not meet the test established by this Court in *Barker v. City of Charleston,* 134 W.Va. 754, 61 S.E.2d 743 (1950). In syllabus point two of *Barker,* we held that

To entitle a property owner to certiorari to review the action of a city council in vacating and closing a street, the petitioner must allege that his property abuts on that part of the street vacated, or that he will suffer special or peculiar damage or inconvenience not common to all.

This Court observed in *Barker* that

the petition contained no allegation to the effect that any of the properties of petitioners fronted or abutted on that part of the street or alleys vacated and closed, or to the effect that the vacating and closing

---

purpose of guiding and accomplishing a coordinated, adjusted and harmonious development of the area. . . . " W.Va.Code § 8–24–16 (1969) (Repl.Vol.1998).

**31.** *See supra* notes 28, 29.

of the same would in any way injure, prejudice or inconvenience petitioners, or any of them, in any manner, except to the extent that such injury, prejudice or inconvenience would be suffered by all others of the community wherein the properties of petitioners are situated.

*Id.* at 756, 61 S.E.2d at 745.

■ In rejecting Arcadia's standing arguments, the lower court found that "there is uncontroverted evidence in the record that Myers, Stine and Corliss are farmers and residents of the area immediately surrounding Duffields, where Harvest Hills would be located." The circuit court found further that "Myers, Stine and Corliss (or persons in their employ) of necessity must upon occasion utilize Flowing Springs Road to traverse from one portion of their farm to another with tractors and related implements." Based on their proximity to the proposed development and their occupation as farmers, the lower court concluded that "Petitioners Myers, Stine, and Corliss have an interest in this matter that is different from the interests of other citizens at large." Determining that the Landowners had "made the requisite factual showing of alleged 'distinct' or 'peculiar' harm," the circuit court found no procedural impediment to the review sought by the Landowners.[32]

In resolving the issue of who qualifies as "aggrieved" within the meaning of West Virginia Code § 8–24–59, the circuit court concluded

that individuals such as petitioners who live in close proximity to the project, who farm, and who demonstrate that their farming activities are at risk of being deleteriously affected or even terminated by conditions expected to be generated or worsened by the project, such as increased traffic, a lowering ground water table, crowding, and the myriad problems that would appear to attend the juxtaposition in close proximity of farms and farmers with more or less suburban-style residents of single-family houses (including, as has been suggested, liability exposure, nuisance lawsuits, noise, dust and smell complaints, cut fences, and children enticed to play with horses or other livestock), have standing to challenge the major decisions of the county's local governing bodies approving a conditional use permit. . . . (footnote omitted)

■ Notwithstanding Arcadia's strenuous protests on this issue, we find no basis for finding error with regard to the lower court's finding that the Landowners qualified as "aggrieved" persons who thereby had standing to challenge the issuance of the conditional use permit. While the Landowners involved did raise concerns that at first blush might appear to be in common with all the citizens of Jefferson County, such as increased traffic, water table lowering, and other growth-related effects on the existing infrastructure, they proceeded to demonstrate how those concerns would bring about particularized harm given their specific occupational needs as farmers. Accordingly, we hold that a person qualifies as "aggrieved" within the meaning of West Virginia Code § 8–24–59 and thereby has standing to challenge a decision or order of the Board of Zoning Appeals as illegal where the individual demonstrates that, as a result of the challenged ruling, he/she will uniquely suffer injury separate and apart from that which the general citizenry might experience as a result of the same ruling.

Based on the foregoing, the decision of the Circuit Court of Jefferson County reversing the issuance of the conditional use permit by the Jefferson County Board of Zoning Appeals is hereby reversed and the matter is referred back to the Commission for the express purpose of reinstating the conditional use permit that was previously issued to Arcadia.

Reversed.

---

**32.** The other three Landowners were permitted to proceed under the theory of "dependent standing," a doctrine unique to zoning matters whereby multiple parties are permitted to bring such challenges, provided at least one petitioner has standing. *See Lindsey Creek Area Civic Assn. v. Consolidated Govt. of Columbus,* 249 Ga. 488, 292 S.E.2d 61, 63 n. 4 (1982); *accord Cohen v. Zoning Bd. of Appeals,* 35 Mass.App.Ct. 619, 624 N.E.2d 119, 121 (1993).

Chief Justice STARCHER concurs and reserves the right to file a concurring opinion.

Justice McGRAW dissents and reserves the right to file a dissenting opinion.